IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| Jaime Obregon Acosta, individually and on behalf of others similarly situated, | ) ) ) ) | Civil Action File No. |
| Plaintiff, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| SMART Alabama, LLC and AGWM United, LLC, | ) ) ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

COMES NOW, Plaintiff Jaime Obregon Acosta ("Plaintiff" or "Mr. Obregon"), individually and on behalf of other similarly situated workers, by and through his counsel, and brings this *Class Action Complaint* for damages against Defendants SMART Alabama, LLC ("SMART") and AGWM United, LLC ("AGWM") (collectively, "Defendants").

### I.      Introduction

1.      Over a period of approximately three years, Defendants have cheated the United States immigration system to unlawfully employ Mexican nationals on an auto parts production line in Alabama and to pay them wages

that were lower than U.S. citizens workers doing the same work.

2.      To secure TN visas for the Mexican nationals, the Defendants told the government the workers would be employed as engineers, rather than as assembly line workers.

3.      Once in Alabama, the Mexican nationals had to work horrendously long hours on the production line at hourly wages that were a fraction of what the U.S. citizens on the same line.

4.      Defendants' conduct violated the Racketeer Influenced and Corrupt Organizations Act("RICO").

5.      SMART's conduct also violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

6.      Mr. Obregon, on behalf of the RICO Class (as defined below), seeks compensatory and trebled damages, as well as attorneys' fees and costs, for the Defendants' violations of the RICO.

7.      Mr. Obregon, on behalf of the Discrimination Class (as defined below), seeks compensatory and punitive damages, as well as attorneys' fees and costs, for the Defendants' Title VII and Section 1981 violations.

II.        **Jurisdiction and Venue**

8.        The Court has subject matter jurisdiction over this action, which arises under federal statutory law.[1]

9.        Venue is proper in this district and division because (1) Defendant AGWM is a resident of this district and division; and (b) a substantial part of the acts and/or omissions giving rise to the claims alleged in this Complaint occurred within this district.

10.        Pursuant to the RICO, this Court has personal jurisdiction over Defendants because AGWM resides in this district and is an agent of SMART, SMART agents Total Employee Solution Support, LLC and WK Law Group, PC reside in this district, and "the ends of justice" require that this Court have jurisdiction over all Defendants.[2]

11.        On August 4, 2021, Mr. Obregon signed and submitted to the U.S. Equal Employment Opportunity Commission ("EEOC") a Charge of Discrimination naming SMART as the respondent employer.

---

[1]  *See* 28 U.S.C. § 1331.
[2]  *See* 18 U.S.C. §§ 1965 (a), (b), and (d).

12.     On December 29, 2021, the EEOC issued a Dismissal and Notice of Rights to Mr. Obregon, making no determination about the merits of Mr. Obregon's claims.

13.     Mr. Obregon timely brings the Title VII claims herein, as the instant action has been filed within 90 days of the EEOC's issuance of the Dismissal and Notice of Rights.

### III.     Parties

14.     Plaintiff Jaime Obregon Acosta came to Alabama from Mexico on a TN visa on or about October 15, 2020 to work for SMART.

15.     Mr. Obregon holds a Bachelor of Science in Mechanical Engineering and a Master's degree in Business Administration.

16.     Mr. Obregon currently resides in Mexico.

17.     Mr. Obregon and other similarly situated workers are citizens of Mexico and are not citizens of the United States.

18.     Mr. Obregon and other similarly situated workers are of Mexican national origin.

19.     Mr. Obregon and other similarly situated workers are Hispanic.

20.     At all relevant times, Mr. Obregon and other similarly situated workers were employees of SMART within the meaning of Title VII.

21.     At all relevant times, Mr. Obregon and other TN visa holders

employed at SMART were each a "person" within the meaning of that term as

defined by the RICO, in that each Mr. Obregon and other TN visa holders were

individuals capable of holding a legal or beneficial interest in property.[3]

22.     Defendant AGWM is a Georgia domestic limited liability company,

with its principal place of business at 4405 Village Field Pl, Suwanee, GA, 30024-

5199, located in Gwinnett County.

23.     According to AGWM's website, it "recruits qualified TN visa

candidates who are allowed to work in the United States. We offer the best

human resources services for aerospace, automotive and manufacturing

companies across the United States."[4]

24.     Defendant SMART is (a) a Delaware limited liability company; (b)

registered with the Alabama Secretary of State as a foreign limited liability

company; and (c) has as its principal address 401 Adams Avenue, Suite 780,

Montgomery, AL 36104.

25.     According to SMART's website, it is "an automotive parts

manufacturer… SMART currently produces stamped metal and robotic welded

---

[3] *See* 18 U.S.C. § 1961(3).
[4] *See* http://agwmunited.com/ (last viewed March 25, 2022).

assemblies for 3 vehicles … for its customer, Hyundai Motor Manufacturing Alabama (HMMA). SMART has a production capacity of 400,000 vehicles/year…..”[5]

26.    SMART reported to the U.S. Internal Revenue Service that it held over $236 million in assets at the end of fiscal year 2019.

27.    At all relevant times, SMART employed Mr. Obregon and other similarly situated workers within the meaning of Title VII.

28.    Defendant AGWM is Defendant SMART's agent for the purpose of recruiting and hiring TN visa holders from Mexico to work at SMART's Luverne, Alabama automobile components plant.

29.    Defendants are "persons" within the meaning of that term as defined by the federal RICO, in that they are entities capable of holding a legal or beneficial interest in property.[6]

30.    Defendants SMART and AGWM were an enterprise ("RICO Enterprise I") within the meaning of that term as defined by the RICO in that they were associated in fact though not a legal enterprise.[7]

---

[5]  *See* https://www.smart-alabama.com/about-us (last viewed March 25, 2022).
[6]  *See* 18 U.S.C. § 1961(3).
[7]  *See* 18 U.S.C. § 1961(4).

31.     Defendants SMART, AGWM, and WK Law Group, PC were an enterprise ("RICO Enterprise II") within the meaning of that term as defined by the RICO in that they were associated in fact though not a legal enterprise.[8]

32.     Defendants SMART, AGWM, Total Employee Solution Support, LLC ("TESS"), and WK Law Group, PC were an enterprise ("RICO Enterprise III") within the meaning of that term as defined by the RICO in that they were associated in fact though not a legal enterprise.[9]

33.     At all relevant times, RICO Enterprise I, II, and III were engaged in, or their activities affected, interstate and/or foreign commerce.[10]

34.     At all relevant times, Defendants were associated with RICO Enterprises I, II, and/or II.

**IV.     Background and Structure of the TN Visa Program.**

35.     The North American Free Trade Agreement ("NAFTA"), which came into force on January 1, 1994, created a special trade relationship between the United States, Mexico, and Canada.[11]

---

[8] *See Id.*

[9] *See Id.*

[10] *See* 18 U.S.C. 1962(c).

[11] *See generally,* North American Free Trade Agreement, Can.-Mex.-U.S., Dec. 17, 1992, 32 I.L.M 289 (1993).

36.     The U.S. government created the TN nonimmigrant classification, commonly known as the TN visa, to permit Mexicans and Canadians professionals in certain occupations ("TN profession") to temporarily enter the United States for employment within their profession.[12]

37.     Engineers are among the categories of professionals permitted entry into the United States with TN visas.[13]

38.     A Mexican citizen applying for a TN visa

must present documentation sufficient to satisfy the consular officer … that the applicant is seeking entry to the United States to engage in business activities for a United States employer(s) or entity(ies) at a professional level, and that the applicant meets the criteria to perform at such a professional level. This documentation may be in the form of a letter from the prospective employer(s) in the United States or from the foreign employer, and must be supported by diplomas, degrees or membership in a professional organization…The documentation shall fully affirm:

(A) The [TN] profession of the applicant;

(B) A description of the professional activities, including a brief summary of daily job duties, if appropriate, in which the applicant will engage in for the United States employer/entity;

(C) The anticipated length of stay;

(D) The educational qualifications or appropriate credentials which demonstrate that the … Mexican citizen has professional level status; and

---

[12] *See* 8 C.F.R. § 214.6(a).
[13] *See* 8 C.F.R. § 216.4(c) (incorporating Appendix 1603.D.1 to Annex 1603 of the NAFTA).

(D) The arrangements for remuneration for services to be rendered.[14]

39.    The TN visa applicant "must engage in a prearranged business activity at a professional level for a U.S. or foreign employer."[15]

40.    Once an applicant has provided the required evidence set forth in the preceding paragraph, the applicant is admitted under the TN visa classification for a period of up to three years.[16]

41.    The TN visa is tied to the associated employer for the duration of the TN visa period unless the TN visa holder submits a verified petition to USCIS seeking to add or change employers.[17]

42.    Since 1997, the number of TN visas issued has increased significantly every year, with the exception of 2020 due to the COVID-19 pandemic.  For example, in 1997, 287 TN visas were issued to Mexican

---

[14] 8 C.F.R. § 214.6(d)(3)(ii).
[15] 9 F.A.M. § 402.17-5(A).
[16] *See* 8 C.F.R. § 214.6(e).
[17] 9 F.A.M. § 402.17-5(A)(7) (the petitioner must file a Form I-129, Petition for Nonimmigrant Worker).

nationals.[18]  By 2007, the number had increased to 4,060.[19]  In 2017, it had grown

to 15,993 visas;[20]  In 2021, 24,904 TN visas were issued.[21]

43.    Oversight of TN visa holders' working conditions in the United

States is largely unregulated.  As a consequence, there have been multiple

reports of abuses—including misrepresentations in employment contracts—of

TN workers.[22]

---

[18] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 1998) https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY1998_NIV_Detail_Table.pdf (last viewed March 25, 2022).

[19] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2007) https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY07NIVDetailTable.pdf (last viewed March 25, 2022).

[20] *See* Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2017) https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY17NIVDetailTable.pdf (last viewed March 25, 2022).

[21] *See* Nonimmigrant Visas Issued by Classification: Fiscal Years 2017-2021, U.S. Department of State (2021). Though the State Department had not yet broken down the 2021 TN visas issued by nationality, over 99 percent of TN visas historically have been issued to Mexican—rather than Canadian—citizens. *See generally*, n's. 10-12, *supra.*

[22] Coerced under NAFTA: Abuses of Migrant Workers in the TN Visa Program and Recommendations for Reform, Centro de los Derechos del Migrante (Dec. 2017), https://cdmigrante.org/wp-content/uploads/2018/01/Coerced-under-NAFTA_-Abuses-of-Migrant-Workers-in-TN-Visa-Program.pdf (last viewed March 25, 2022).

**V.** <u>**Statement of Facts**</u>

    **a. The RICO Fraud**

44.    The acts and omissions described in paragraphs, 45-84, *infra*, were committed by the indicated Defendant or Defendants through RICO Enterprises I, II and/or III.

45.    In January 2020, Mr. Obregon saw an AGWM job posting for a Quality Control Engineer in the southeastern United States.  The posting was on the BUMERMAN website.

46.    On or about January 23, 2020, Mr. Obregon applied for the position, which included submitting his resume in Spanish.

47.    On January 23, 2020, AGWM sent Mr. Obregon an email confirming receipt of his resume for the position of a Quality Control Engineer in the southeastern United States.  The email instructed Mr. Obregon to resubmit his resume in English.

48.    On January 24, 2020 at 8:31 a.m., Mr. Obregon resubmitted his resume to AGWM in English, but in pdf format.

49.    At 3:28 p.m. the same day, Ana Maria Rodriguez who, upon information and belief, was an employee of AGWM, sent an email to Mr.

Obregon asking him to resubmit his resume again in Word format.  He did so

nine minutes later.

50.    On September 12, 2020, AGWM employee Julian Kim sent Mr.

Obregon an email.  In the email, Ms. Kim indicated among other things,

    a.  The email was not a scam ("estafa" in Spanish) or hoax

       ("engaño" in Spanish).

    b.  SMART was interested in hiring him;

    c.  He would work on the production line for one year and would

       receive a promotion to an engineer position through his

       evaluation;

    d.  His wages would be $38,000-$43,000 USD.

    e.  His employment would be for a period of one year;

    f.  He would be sponsored for a green card after 18 months; and

    g.  He should respond by completing an attached form "as soon as

       possible" to schedule an interview with SMART.

51.    At the time Ms. Kim sent the email described in paragraph 50, she

and other AGWM management personnel who authorized the communication

knew Defendant SMART would misrepresent to the United States government

that Mr. Obregon would be employed as an Industrial Quality Engineer, rather than a production line worker.

52.     At the time Ms. Kim sent the email described in paragraph 50, she and other AGWM management personnel knew and intentionally omitted the material fact that the misrepresentation to the United States government likely would impact Mr. Obregon's future eligibility for a green card.

53.     On September 13, 2020, Mr. Obregon completed the required AGWM form and emailed it to AGWM.  The form listed SMART as the employer.

54.     On September 15, 2020. Mr. Obregon had a Skype interview with SMART Employee Relations Specialist Cynthia Rios and a Korean Assembly Department Manager.

55.     During the Skype interview, Ms. Rios told Mr. Obregon he would be eligible and sponsored for a green card after 18 months.

56.     During the Skype interview, Ms. Rios knew and intentionally omitted the material fact that the misrepresentation to the United States government likely would impact Mr. Obregon's future eligibility for a green card.

57.     On September 15, 2020, Ms. Kim sent an email to Mr. Obregon on behalf of AGWM. In the email, Ms. Kim indicated, among other things,

a.  Mr. Obregon was selected for the position at SMART;

b.  Mr. Obregon should review the attached job offer, sign it, and email it to WK Law Group, PC as soon as possible;

c.  After Mr. Obregon sent the signed job offer to Woon (Andy) Kim, the attorney at WK Law Group, PC, Mr. Kim would send an email requesting the documents that were necessary for the visa application.

58.     The job offer attached to Ms. Kim's September 15, 2020 email offered Mr. Obregon a position as a Quality Engineer at SMART.  The job offer was on SMART letterhead.  It also indicated the position would be for up to one year, with an annual salary of $38,000.

59.     At the time AGWM and SMART representatives sent the job offer described in paragraph 58 to Mr. Obregon, the AGWM and SMART representatives knew Mr. Obregon would not work as a Quality Engineer at SMART.

60.     On September 15, 2020, Woon (Andy) Kim, an immigration attorney with WK Law Group acting as an agent of AGWM and SMART, sent Mr. Obregon an email

      a.  introducing himself;

      b.  referencing an attached "basic document list" and asking Mr. Obregon to send the listed documents,

      c.  referencing an attached "questionnaire form" and asking Mr. Obregon to answer the questions on the form;

      d.  Informing Mr. Obregon of the consular interview process;

      e.  Describing the process to pay the U.S. government fee for processing the TN visa.

61.      A Certificate showing Mr. Kim's admission to practice law in New York also was attached to his September 15, 2020 email.

62.     Though Mr. Kim's law office is based in Duluth, Georgia, he is not licensed to practice law in Georgia.

63.     On September 17, 2020, Mr. Obregon transmitted the requested completed questionnaire and supporting documents by email to Mr. Kim.  They then exchanged additional emails related to the questionnaire and documents

later on September 17, 2020; on September 18, 2021; on September 21, 2021; and on September 23, 2021.

64.     Mr. Kim, "Ellie Kim" (evidently an employee of Mr. Kim's law office), and Mr. Obregon exchanged emails about the consular interview process and scheduling on September 30, 2020 and October 1, 2020.

65.     On October 1, 2020, Mr. Kim sent Mr. Obregon two emails. The first email included,

    a.  a letter signed by Mr. Kim to the U.S. Consulate in Mexico City attaching documents purportedly supporting Mr. Obregon's TN visa application.

    b.  An interview preparation sheet, which Mr. Kim specifically indicated Mr. Obregon should use for consular interview preparation but should not bring to the interview.  The preparation sheet,

        i.  Instructed Mr. Obregon to inform the consular official that he intended to return to Mexico after completing the work and specifically indicated he should not say he would apply for permanent residency (green card) in the United States.

      ii.  Informed Mr. Obregon his application would be denied if he indicated he intended to, *inter alia*, apply for a green card.

      iii.  Informed Mr. Obregon that it is not necessary to provide all information, and that he should only answer the consular officer's questions.

c.  A DS-160 form, which Mr. Kim also indicated Mr. Obregon should use for consular interview preparation but should not bring to the interview.  The DS-160 form described

d.  A position description sheet, which Mr. Kim also indicated Mr. Obregon should use for consular interview preparation but should not bring to the interview.  The description sheet listed the duties of an Industrial Quality Engineer at SMART.  The duties did not include work on the production line as an assembly worker.

66.    At the time Mr. Kim, acting as an agent for SMART and AGWM, sent the email and attachments described in paragraph 65, Mr. Kim knew,

    a.  SMART and AGWM had informed Mr. Obregon that he would

       be sponsored for a green card after working at SMART for 18

       months;

    b.  Mr. Obregon would not work at SMART as an Industrial Qualify

       Engineer, but rather would work on the production line as an

       assembly worker; and

    c.  Any misrepresentations made to the U.S. government likely

       would make Mr. Obregon ineligible for a green card.

67. At the time Mr. Kim sent the email described in paragraph 65, he knew and intentionally omitted the material fact that the misrepresentation to the United States government likely would impact Mr. Obregon's future eligibility for a green card.

68. Mr. Obregon relied on the material omissions and misrepresentations set forth in paragraphs 65-67.

69. The second October 1, 2020 email Mr. Kim sent to Mr. Obregon included, as an attachment, SMART's letter supporting Mr. Obregon's TN visa application ("TN Support Letter").

70. On October 1, 2020, Gary R. Sport, Administration General Manager of SMART Automotive, signed the TN Support Letter addressed to the Acting

Nonimmigrant Visa Section Chief of the United States Consulate in Guadalajara, Jalisco, Mexico.

71.     The TN Support Letter indicated Mr. Obregon would be employed for a one-year period "as an Industrial Quality Engineer in our Production Department at our facilities in Luverne, Alabam [*sic*]."

72.     The TN Support Letter described with detail the work Mr. Obregon would perform as an Industrial Quality Engineer.  The words used to describe his work were: "Evaluate…" twice, "Assess and analyze…", "Oversee production…", "Document…", "Work in coordination with Assembly Line and Press Line team to advise and address inefficiencies…", "Analyze…", "Deliver quality assurance…", "Adjust test plans or methods…", "Stay updated…", "Perform supplier assessments…"; and "Periodically review client complaints…".

73.     Continuing, the TN Support Letter noted,

The duties of the position offered and the very nature of SMART services require that a candidate possess a bachelor's degree in Industrial Engineering, Quality Engineering, Mechanical Engineering, or an engineering-related field. SMART typically requires this educational credential as a minimum requirement for entry into this occupation. This is also common to the manufacturing industry in parallel positions in similar organizations.

74.     At the time SMART submitted the TN Support Letter, Gary R. Sport and other SMART management personnel who authorized the letter knew Mr. Obregon would not be employed at SMART as an Industrial Quality Engineer. Rather, they knew

    a.  Mr. Obregon would work on the production line as an assembly worker;

    b.  Mr. Obregon would exclusively perform work that was identical to other employees with no engineering training or credentials; and

    c.  Engineering training and credentials were not required or necessary to perform the assembly line work.

75.     Therefore, SMART made material misrepresentations in the TN Support Letter.

76.     The U.S. government, relying on SMART's misrepresentations in the TN Support Letter, issued at TN visa to Mr. Obregon.

77.     On October 2, 2020, "Daniela" from AWGN sent Mr. Obregon a message on WhatsApp informing him that his TN visa had been approved.

78.     Upon information and belief, RICO Enterprise III member TESS also recruited Mexican TN visa holders for SMART by misrepresenting the nature of the work the TN visa holders would perform.

79.     RICO Enterprise II and III member WK Law Group, PC provided legal representation to SMART and AWGN for the purpose of securing TN visas for SMART employees.

80.     At the time WK Law Group, PC provided legal representation to SMART and AWGN, it was acting as an agent of SMART and AWGN, and all its acts and omissions occurred within the scope of this agency.

81.     Defendants engaged in similar separate fraudulent acts for the purpose of recruiting and employing dozens of Mexican TN visa holders between 2019 and the present.

82.     Defendants used the mail and wires for the purpose of executing the fraudulent scheme described in the preceding paragraphs.

83.     Plaintiff and other similarly situated workers suffered pecuniary losses, including low wages and lost employment opportunities, as a consequence of Defendants' fraud.

### b. Employment Discrimination

84.     SMART employed both Hispanic Mexican citizens ("Mexican workers") and white and black U.S. citizen workers ("U.S. workers") performing similar work on SMART's production line.

85.     The Mexican workers with TN visas were paid an hourly wage rate that was significantly lower than the hourly wage rate paid to the U.S. workers.

86.     Upon information and belief, Mexican workers without TN visas also were paid an hourly wage that was significantly lower than the hourly wage rate paid to the U.S. workers.

87.     The Mexican workers were required to work significantly longer hours than the U.S. workers.

88.     Defendants' disparate treatment of the Mexican workers as compared to the U.S. workers who performed the same or similar work constituted discrimination based on race and alienage, in violation of 42 U.S.C. § 1981.

89.     Defendants' disparate treatment of the Mexican workers as compared to the U.S. workers who performed the same or similar work constituted discrimination based on race, color, and national origin, in violation of Title VII.

<u>Rule 23 Class Allegations</u>

90.     Mr. Obregon brings his RICO claims against Defendants AWGN

and SMART on behalf of himself and a class of persons ("the RICO Class")

consisting of:

> All individuals who, between March 28, 2018 and the present,
> (1) were recruited by AWGN, (2) received wages from
> SMART; and (3) were TN visa holders.

91.     Mr. Obregon brings his Section 1981 and Title VII claims against

Defendant SMART on behalf of himself and a class of persons ("the

Discrimination Class") consisting of:

> All individuals who, between March 28, 2018 and the present,
> (1) were Hispanic Mexican nationals, and (2) were employed
> at SMART.

92.     Excluded from the Classes are the legal representatives, officers,

directors, assigns, and successors of Defendants; any individual who at any time

during the class period has had a controlling interest in any Defendant; and all

persons who submit timely and otherwise proper requests for exclusion from the

Class.

*Numerosity*

93.     Upon information and belief, there are over 40 individuals who would be members of the Classes in this action.

94.     The members of the Classes are sufficiently numerous that joinder of all members is impractical.

*Existence and Predominance of Common Questions*

95.     Common questions of law and fact exist as to Plaintiffs and all members of the Classes and predominate over questions affecting only individual Class members.

96.     These common questions include:

a)      Whether Defendants, through RICO Enterprises I and/or II, committed a pattern of racketeering activity causing Plaintiff and other TN visa holders to suffer pecuniary losses;

b)      Whether SMART discriminated against Plaintiff and other Hispanic Mexican workers (i) by paying them less than black and white U.S. citizen workers, and/or (ii) by requiring them to work longer hours than the black and white U.S. citizen workers;  and

c)      The nature and extent of class-wide injury and the measure of

damages for those injuries.

*Typicality*

97.     Members of the proposed Classes have all been subject to the same

unlawful practices of Defendants, and their claims arise out of these same

practices.

98.     Plaintiff and the proposed class members have the same statutory

rights under RICO, Section 1981, and Title VII within the meaning of these laws.

99.     Plaintiff and the proposed members of the RICO Class were

recruited under the same or similar circumstances giving rise to the same claims.

100.    Plaintiff and the proposed members of the Discrimination Class

were employed under the same or similar circumstances giving rise to the same

claims.

101.    Plaintiff and proposed class members suffered similar types of

damages.

102.    Plaintiff's claims are typical of the claims of the Class because,

among other things, Plaintiff (a) was a TN visa holder; (b) is a Hispanic Mexican

national; and (c) was an employee who worked for the SMART and suffered the same violations as the proposed class members.

103.    Plaintiff's interests are co-extensive with the interests of the Class members; Plaintiff has no interest adverse to the Class members.

*Adequacy*

104.    Plaintiff will fairly and adequately represent the interests of the class members.   His interests do not conflict with the interests of the members of the Class he seeks to represent.

105.    Plaintiff understands that, as Class representatives, he assumes a responsibility to the class to represent its interests fairly and adequately.

106.    Plaintiff has retained counsel experienced in prosecuting class actions and in employment matters.  There is no reason why Plaintiff and his counsel will not vigorously pursue this matter.

*Superiority*

107.    A class action is superior to other available means for the fair and efficient adjudication of the claims at issue herein.

108.    The damages suffered by each individual Class member may not be sufficient to justify the burden and expense, particularly in light of the

transnational nature of this case, of individual prosecution of the litigation necessitated by Defendants' conduct.

109.    Further, it would be difficult for members of the Class to obtain individual redress effectively for the wrongs done to them.   If individual actions were to be brought by each member of the Class, the result would be a multiplicity of actions, creating hardships for members of the Class, the Court, and the Defendants.

110.    Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system.

111.    By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

112.    This case does not present individualized factual or legal issues which would render a class action difficult.

113.    In the alternative, the Class may be certified because: (a)  the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for

Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

### VI.   <u>Legal Claims</u>

### <u>Count I</u>

<u>Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-68</u>
<u>(Class Claim)</u>
<u>(Against All Defendants)</u>

114.   Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

115.   This Count sets forth claims by Plaintiff and other members of the RICO Class against all Defendants for damages resulting from Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-68.

116.    Plaintiff is a "person" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

117.    Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

118.    RICO Enterprises I, II, and III (collectively, "the RICO Enterprises"), as defined in paragraphs 30-32, *supra*, are association-in-fact enterprises with the common purpose to recruit, contract, transport, and employ Mexican TN visa holders to work at SMART's business operations in Alabama.

119.    The RICO Enterprises are engaged and affect in interstate commerce

120.    The RICO Enterprises function as continuing units.

121.    The Defendants conducted or participated in the affairs of the RICO Enterprises, through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and/or 18 U.S.C. § 1962(d), related by their common purpose.

122.    Specifically, the Defendants conducted or participated in the affairs of the RICO Enterprises by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

     a.  Mail fraud in violation of 18 U.S.C. § 1341;

     b.  Wire fraud in violation of 18 U.S.C. § 1343; and

c.  Fraud in foreign labor contracting in violation of 18 U.S.C. § 1351.

*Predicate Acts*

Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343

123.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, made material misrepresentations to the U.S. government and to TN visa applicants regarding the nature of Plaintiff's and other RICO Class members' work, the hours they would work, and the wages they would receive.

124.   As set forth in the preceding paragraphs, the Defendants, though the RICO Enterprises, used and/or conspired to use the mails and wire communications, including communications via telephone, fax, internet, and/or email, on numerous occasions to further these fraudulent schemes.

125.   These willful, knowing, and intentional acts constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

Fraud in Foreign Labor Contracting: 18 U.S.C. § 1351

126.   As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, knowingly and with intent to defraud, recruited, solicited, and hired Plaintiff and other RICO Class members outside the United States, for

the purpose of employment in the United States by means of materially false or fraudulent pretenses, representations, or promises regarding the nature of Plaintiff's and other RICO Class members' work, the hours they would work, and the wages they would receive.

127.    These willful, knowing, and intentional acts constitute fraud in foreign labor contracting in violation of 18 U.S.C. § 1351.

### *Pattern of Related Racketeering Acts*

128.    The Defendants engaged in the racketeering activity described in this claim repeatedly in 2018 through 2021.

129.    The Defendants, through the RICO Enterprises, rely on the racketeering acts described in this Complaint to conduct their regular business activities.

130.    The Defendants' racketeering acts have or had similar purposes: to profit from the fraud Defendants committed in the contracting, hiring, and employment of Plaintiff and other RICO Class members.

131.    Each of the Defendants' acts yielded similar results and caused similar injuries to Plaintiff and other RICO Class members, including underpayment of wages and lost employment opportunities.

132.    As set forth in the preceding paragraphs, the racketeering acts have or had similar participants: the Defendants and their agents.

133.    As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, directed their racketeering activities at similar individuals and entities: Plaintiff and other RICO Class members, and federal government agencies.

134.    The Defendants' acts have or had similar methods of commission, such as common recruitment tactics and use of similar employment practices and policies with respect to Plaintiff and other RICO Class members.

<u>*Injury and Remedies*</u>

135.    As a direct and proximate result of the Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiff and RICO Class members have suffered injuries to their property, including but not limited wage underpayments, lost employment opportunities, and/or losses to real or personal property.

136.    Plaintiff and other RICO Class members are entitled to an award of damages in an amount to be determined at trial, including but not limited to:

   a.   compensation for their injuries to their property;

   b.   trebling of the damages set forth in subparagraph (a), *supra*; and

c. attorneys' and experts' fees and costs associated with this action, as authorized by 18 U.S.C. § 1964(c).

## Count II

Employment Discrimination in Violation of 42 U.S.C. § 1981
(Class Claim)
(Against Defendant SMART)

137.    The Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

138.    This Count sets forth claims by Plaintiff and other members of the Discrimination Class against Defendant SMART for damages resulting from violations of 42 U.S.C. § 1981 ("Section 1981").

139.    The actions of SMART, as set forth herein, violated Plaintiff's and other Discrimination Class members' rights to receive full and equal benefit of all laws as guaranteed by Section 1981, including Plaintiff's and other Discrimination Class Members' rights to enjoy and benefit from non-discriminatory employment relationships with SMART.

140.    As set forth herein, SMART imposed discriminatory terms and conditions of employment on Plaintiff and other Discrimination Class

members—specifically paying lower hourly wages and requiring longer work hours—to which black, white, and/or U.S. citizen employees were not similarly subjected.

141.   SMART knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiff and other Discrimination Class members of their rights.

142.   Plaintiff and other Discrimination Class members seek all appropriate relief in an amount to be determined at trial, including, but not limited to:

      a.   compensatory damages for the deprivation of Plaintiff's and other Discrimination Class members' civil rights;

      b.   punitive damages for SMART's malicious and reckless discriminatory conduct;

      c.   attorneys' and experts' fees and costs of this action.

## Count III

### Employment Discrimination in Violation of Title VII
### (Class Claim)
### (Against Defendant SMART)

143.    The Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

144.    This Count sets forth claims by Plaintiff and other members of the Discrimination Class against Defendant SMART for damages resulting from SMART's violations of § 702(a) of Title VII, 42 U.S.C. § 2000e-2(a) ("Title VII").

145.    For the entire term of their employment, SMART subjected Plaintiff and other members of the Discrimination Class to terms and conditions of employment that were less favorable than those enjoyed by their counterparts who were not Hispanic and/or of Mexican national origin.

146.    This unequal treatment included but was not limited to lower wages and longer work hours.

147.    The unlawful employment practices complained of in the preceding paragraphs were intentional and done with malice or with reckless indifference to the federally protected rights of Plaintiff and other Discrimination Class members.

148.    The effect of these intentional practices has been to deprive Plaintiff and other Discrimination Class members of equal employment opportunities and otherwise adversely affect their status as employees because of their race, color, and/or national origin.

149.    Plaintiff and other Discrimination Class members seek all appropriate relief in an amount to be determined at trial, including, but not limited to:

     a.  compensatory damages for the deprivation of Plaintiff's and other Discrimination Class members' rights as set forth in this Count;

     b.  punitive damages for SMART's malicious and reckless discriminatory conduct; and

     c.  attorneys' and experts' fees and costs of this action.

**VII.    Demand for Trial by Jury**

150.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all questions of fact raised by this Class Action Complaint.

**VIII.** <u>**Request for Relief**</u>

WHEREFORE, Plaintiff requests that this Court enter an Order:

a.      assuming jurisdiction over this action;

b.      certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Class Counsel;

c.      declaring that Defendants violated the RICO, Section 1981, and Title VII;

d.      permanently enjoining Defendants from further violations of the RICO, Section 1981, and Title VII;

e.      granting judgment to Plaintiff and other RICO Class members, and against all Defendants, on Plaintiff's and other RICO Class members' RICO claims and awarding them the trebled amount of their pecuniary losses;

f.      granting judgment to Plaintiff and other Discrimination Class members, and against Defendant SMART, on Plaintiff's and other Discrimination Class members' claims pursuant to Section 1981 and awarding compensatory and punitive damages;

g.      granting judgment to Plaintiff and other Discrimination Class members, and against Defendant SMART, on Plaintiff's and other

Discrimination Class member's claims pursuant to Title VII and awarding

compensatory and punitive damages;

h.      Awarding Plaintiff and other Class members prejudgment and

postjudgment interest as allowed by law;

i.      Awarding Plaintiff and other Class members their costs and

reasonable attorneys' fees; and

j.      Granting such further relief as the Court finds just.

Respectfully submitted this day: March 27, 2022.

*/s/ Daniel Werner*
Daniel Werner
Georgia Bar No. 422070
dan@decaturlegal.com
James Radford
Georgia Bar No. 108007
james@decaturlegal.com
RADFORD & KEEBAUGH, LLC
315 W. Ponce de Leon Ave.
Suite 1080
Decatur, Georgia 30030
(678) 271-0300

*Attorneys for Plaintiff*

<u>CERTIFICATE OF FONT</u>

This is to certify that on March 27, 2022, I prepared the foregoing Class

Action Complaint Book Antiqua, 13-point type in accordance with L.R. 5.1(C).

<u>/s/ Daniel Werner</u>
Daniel Werner
Attorney for Plaintiff