IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| Jaime Obregon Acosta, individually and on behalf of others similarly situated, | ) ) ) ) | Civil Action File No. 1:22-cv-01209-TWT |
| Plaintiff, | ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| SMART Alabama, LLC; and AGWM United, LLC; Total Employee Solution Support, LLC; WK Law Group, PC; and Woon Kim, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

COMES NOW, Plaintiffs Jaime Obregon Acosta ("Mr. Obregon" or

"Plaintiff"), individually and on behalf of other similarly situated workers, by

and through his counsel, and brings this *First Amended Class Action Complaint* for

damages against Defendants SMART Alabama, LLC ("SMART"); AGWM

United, LLC ("AGWM"); Total Employee Solution Support, LLC ("TESS"); WK

Law Group, PC ("WK Law"); and Woon Kim (collectively, "Defendants").

**I.**      **Introduction**

1.      Over a period of approximately three years, Defendants have cheated the United States immigration system to unlawfully employ Mexican nationals on an auto parts production line in Alabama and to pay them wages that were lower than U.S. citizen workers doing the same work.

2.      To secure TN visas for the Mexican nationals, the Defendants told the government the workers would be employed as engineers, rather than as assembly line workers.

3.      Once in Alabama, the Mexican nationals had to work horrendously long hours on the production line at hourly wages that were a fraction of what the U.S. citizens earned on the same line.

4.      The Mexican nationals also were not paid overtime wages based on their regular rate of pay, when factoring in goods and facilities regarded as part of their wages.

5.      Defendants' conduct violated the Racketeer Influenced and Corrupt Organizations Act ("RICO").

6.      SMART's conduct also violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

7.      SMART's failure to pay overtime wages based on the regular rate of

pay violated the Fair Labor Standards Act ("FLSA").

8.      Plaintiff, on behalf of the RICO Class (as defined below), seeks compensatory and trebled damages, as well as attorneys' fees and costs, for the Defendants' violations of the RICO.

9.      Plaintiff, on behalf of the Discrimination Class (as defined below), seeks compensatory and punitive damages, as well as attorneys' fees and costs, for the Defendants' Title VII and Section 1981 violations.

10.     Plaintiff and similarly situated TN visa holders also seek back wages, liquidated damages, attorneys' fees, and costs for SMART's violations of the FLSA.

11.     Finally, Woon Kim and WK Law committed legal malpractice against Mr. Obregon, and Mr. Obregon individually seeks related damages and other relief therefor.

## II.      <u>Jurisdiction and Venue</u>

12.     The Court has subject matter jurisdiction over the RICO, FLSA, Section 1981, and Title VII claims in action because they arise under federal statutory law.[1]

---

[1] *See* 28 U.S.C. § 1331.

13.     The Court has jurisdiction over Plaintiff's pendant state law claim because it is part of the same case or controversy as Plaintiff's federal claims.[2]

14.     Alternatively, the Court has diversity jurisdiction over Plaintiff's state law claim because Defendants Woon Kim and WK Law reside in, regularly conduct business in, and are citizens of the state of Georgia; Plaintiff resides in and is a citizen of Mexico; and the matter in controversy exceeds the sum or value of $75,000.[3]

15.     Venue is proper in this district and division because (1) Defendants AGWM, TESS, Woon Kim, and WK Law are residents of this district and division; and (b) a substantial part of the acts and/or omissions giving rise to the claims alleged in this Amended Complaint occurred within this district.

16.     Pursuant to the RICO, this Court has personal jurisdiction over Defendants because AGWM, TESS, and WK Law reside in this district and are agents of SMART, and "the ends of justice" require that this Court have jurisdiction over all Defendants.[4]

---

[2] *See* 28 U.S.C. § 1367
[3] *See* 28 U.S.C. § 1332.
[4] *See* 18 U.S.C. §§ 1965 (a), (b), and (d).

17.     On August 4, 2021, Mr. Obregon signed and submitted to the U.S. Equal Employment Opportunity Commission ("EEOC") a Charge of Discrimination naming SMART as the respondent employer.

18.     On December 29, 2021, the EEOC issued a Dismissal and Notice of Rights to Mr. Obregon, making no determination about the merits of Mr. Obregon's claims.

19.     Mr. Obregon timely brings the Title VII claims herein, as the instant action was filed within 90 days of the EEOC's issuance of the Dismissal and Notice of Rights.

**III.     <u>Parties</u>**

20.     Plaintiff Jaime Obregon Acosta came to Alabama from Mexico on a TN visa on or about October 15, 2020 to work for SMART.

21.     Mr. Obregon holds a Bachelor of Science in Mechanical Engineering and a Master's degree in Business Administration.

22.     Mr. Obregon currently resides in Mexico.

23.     Plaintiff and other similarly situated workers are citizens of Mexico and are not citizens of the United States.

24.     Plaintiff and other similarly situated workers are of Mexican national origin.

25.   Plaintiff and other similarly situated workers are Hispanic.

26.   At all relevant times, Plaintiff and other similarly situated workers were employees of SMART within the meaning of Title VII.

27.   At all relevant times, Plaintiff and other similarly situated workers were non-exempt employees of SMART within the meaning of the FLSA.

28.   Plaintiff has consented in writing to become a party Plaintiff in this action for claims under the FLSA.  *See* Ex. A (Consent to Sue).

29.   At all relevant times, Plaintiff and other TN visa holders employed at SMART were each a "person" within the meaning of that term as defined by the RICO, in that Plaintiff and other TN visa holders were individuals capable of holding a legal or beneficial interest in property.[5]

30.   Defendant AGWM is a Georgia domestic limited liability company, with its principal place of business at 4405 Village Field Pl, Suwanee, GA 30024-5199, located in Gwinnett County.

31.   Upon information and belief, Defendant AGWM's documents and other evidence are located at its Gwinnett County, Georgia address.

32.   Upon information and belief, Defendant AGWM directed communications to and received communications from Mr. Obregon and other

---

[5] *See* 18 U.S.C. § 1961(3).

similarly situated workers, Defendants Woon Kim and WK Law, and Defendant SMART at Defendant AGWM's Gwinnett County, Georgia address.

33.     According to AGWM's website, it "recruits qualified TN visa candidates who are allowed to work in the United States. We offer the best human resources services for aerospace, automotive and manufacturing companies across the United States."[6]

34.     Defendant TESS is a Georgia domestic limited liability company, with its principal place of business at 2430 Green Mountain Drive, Braselton, GA 30517, located in Gwinnett County.

35.     Upon information and belief, Defendant TESS's documents and other evidence are located at its Gwinnett County, Georgia address.

36.     Upon information and belief, Defendant Tess directed communications to and received communications from prospective SMART employees seeking TN visas and Defendant SMART at Defendant TESS's Gwinnett County, Georgia address.

37.     According to TESS's website, it "is the most efficient recruiting and staffing company in the market.  We provide TN-Visa workers and help

---

[6] *See* http://agwmunited.com/ (last viewed March 25, 2022).

companies scale for growth. We have over 10 years of experience providing

recruiting and staffing services."[7]

38.    According to TESS's Facebook page, it "operates 25,000 workers in

over 20 cities around the USA."[8]

39.    Defendant WK Law is a Georgia Domestic Professional Corporation

with its principal place of business at 3296 Summit Ridge Pkwy, Ste 1510,

Duluth, GA 30096, located in Gwinnett County.

40.    Defendant Woon Kim is the CEO, CFO, Secretary, and Registered

Agent of WK Law.

41.    Defendants Woon Kim and WK Law do business as Woon Kim Law

Group.

42.    Upon information and belief, Defendant Woon Kim's and Defendant

WK Law's documents and other evidence are located at their Gwinnett County,

Georgia address.

43.    Upon information and belief, Defendant WK Law directed

communications to and received communications from Mr. Obregon and other

---

[7]  *See* https://tessus-mex.com/about-us/ (last viewed June 30, 2022).
[8]  *See* https://www.facebook.com/TESS.LLC.USA/ (last viewed June 30, 2022).

similarly situated workers, Defendant AGWM, and Defendant SMART at

Defendant WK Law's Gwinnett County, Georgia address.

44.    According to WK Law's website, "I established Woon Kim Law

Group to do one thing and to do it well - getting approvals for immigration

cases."[9]

45.    Defendant SMART is (a) a Delaware limited liability company; (b)

registered with the Alabama Secretary of State as a foreign limited liability

company; and (c) has as its principal address 401 Adams Avenue, Suite 780,

Montgomery, AL 36104.

46.    Defendant SMART regularly conducts business in the Northern

District of Georgia.

47.    Defendant SMART regularly directed communications to and

received communications from Defendants AGWM, Woon Kim, WK Law, and

TESS through their Gwinnett County, Georgia offices.

48.    Much of the evidence supporting the Plaintiffs' and other putative

class members' claims, including (1) documents related to Defendants'

fraudulent scheme and discrimination in setting the terms and conditions of

---

[9]  *See* http://www.visauslaw.com/about-us.html (last viewed June 30, 2022).

employment; and (2) witnesses who would testify about this scheme and discrimination, are located in Gwinnett County, Georgia.

49.     Defendant SMART's payroll is managed through Ceridian HCM, Inc. ("Ceridian").

50.     Upon information and belief, Ceridian's payroll services, including records reflecting wages earned by Plaintiffs and other SMART employees, are provided through and available at Ceridian's Sandy Springs (Fulton County), Georgia location.

51.     According to SMART's website, it is "an automotive parts manufacturer… SMART currently produces stamped metal and robotic welded assemblies for 3 vehicles … for its customer, Hyundai Motor Manufacturing Alabama (HMMA). SMART has a production capacity of 400,000 vehicles/year…."[10]

52.     SMART reported to the U.S. Internal Revenue Service that it held over $236 million in assets at the end of fiscal year 2019.

53.     At all relevant times, SMART employed Plaintiff and other similarly situated workers within the meaning of Title VII.

---

[10] *See* https://www.smart-alabama.com/about-us (last viewed March 25, 2022).

54.     At all relevant times, SMART was an "employer" of Plaintiff and other similarly situated workers within the meaning of the FLSA.

55.     Defendant SMART is an enterprise engaged in commerce or in the production of goods for commerce.

56.     Defendant SMART has a gross volume of sales made or business done of not less than $500,000 per year.

57.     Defendants AGWM, TESS, and WK Law are Defendant SMART's agents for the purpose of recruiting and hiring TN visa holders from Mexico to work at SMART's Luverne, Alabama automobile components plant.

58.     Each Defendant is a "person" within the meaning of that term as defined by the federal RICO, in that it is an entity capable of holding a legal or beneficial interest in property.[11]

59.     Defendants AGWM, Woon Kim (by and through WK Law), and SMART (collectively the "the AKS Defendants") were an enterprise ("RICO Enterprise I") within the meaning of that term as defined by the RICO in that they were associated in fact though not a legal enterprise.[12]

---

[11] *See* 18 U.S.C. § 1961(3).
[12] *See* 18 U.S.C. § 1961(4).

60.     The AKS Defendants and Hyundai Motor America, Inc. ("Hyundai") were an enterprise ("RICO Enterprise II") within the meaning of that term as defined by the RICO in that they were associated in fact though not a legal enterprise.[13]

61.     The AKS Defendants and TESS were an enterprise ("RICO Enterprise III") within the meaning of that term as defined by the RICO in that they were associated in fact though not a legal enterprise.[14]

62.     The AKS Defendants, TESS, and Hyundai were an enterprise ("RICO Enterprise IV") within the meaning of that term as defined by the RICO in that they were associated in fact though not a legal enterprise.[15]

63.     At all relevant times, the RICO Enterprises were engaged in, or their activities affected, interstate and/or foreign commerce.[16]

64.     At all relevant times, Defendants were associated with the RICO Enterprises.

65.     Alternatively, the AKS Defendants were associated with the RICO Enterprises and Defendants TESS conspired with the AKS Defendants by

---

[13] *See Id.*
[14] *See Id.*
[15] *See Id.*
[16] *See* 18 U.S.C. 1962(c).

adopting the goal of furthering and participating in the objectives of the RICO Enterprises to engage in a fraudulent scheme.[17]

## IV.        Background and Structure of the TN Visa Program.

66.      The North American Free Trade Agreement ("NAFTA"), which came into force on January 1, 1994, created a special trade relationship between the United States, Mexico, and Canada.[18]

67.      The U.S. government created the TN nonimmigrant classification, commonly known as the TN visa, to permit Mexican and Canadian professionals in certain occupations ("TN profession") to temporarily enter the United States for employment within their profession.[19]

68.      Engineers are among the categories of professionals permitted entry into the United States with TN visas.[20]

69.      A Mexican citizen applying for a TN visa

must present documentation sufficient to satisfy the consular officer … that the applicant is seeking entry to the United States to engage in business activities for a United States employer(s) or entity(ies) at a professional level, and that the applicant meets the criteria to perform at such a professional level. This documentation may be in the form of a

---

[17] *See* 18 U.S.C. § 1962(d).

[18] *See generally,* North American Free Trade Agreement, Can.-Mex.-U.S., Dec. 17, 1992, 32 I.L.M 289 (1993).

[19] *See* 8 C.F.R. § 214.6(a).

[20] *See* 8 C.F.R. § 216.4(c) (incorporating Appendix 1603.D.1 to Annex 1603 of the NAFTA).

letter from the prospective employer(s) in the United States or from the foreign employer, and must be supported by diplomas, degrees or membership in a professional organization…The documentation shall fully affirm:

(A) The [TN] profession of the applicant;

(B) A description of the professional activities, including a brief summary of daily job duties, if appropriate, in which the applicant will engage in for the United States employer/entity;

(C) The anticipated length of stay;

(D) The educational qualifications or appropriate credentials which demonstrate that the … Mexican citizen has professional level status; and

(D) The arrangements for remuneration for services to be rendered.[21]

70.     The TN visa applicant "must engage in a prearranged business activity at a professional level for a U.S. or foreign employer."[22]

71.     Once an applicant has provided the required evidence set forth in the preceding paragraph, the applicant is admitted under the TN visa classification for a period of up to three years.[23]

---

[21] 8 C.F.R. § 214.6(d)(3)(ii).
[22] 9 F.A.M. § 402.17-5(A).
[23] *See* 8 C.F.R. § 214.6(e).

72.    The TN visa is tied to the associated employer for the duration of the TN visa period unless the TN visa holder submits a verified petition to USCIS seeking to add or change employers.[24]

73.    Since 1997, the number of TN visas issued has increased significantly every year, with the exception of 2020 due to the COVID-19 pandemic.  For example, in 1997, 287 TN visas were issued to Mexican nationals.[25]  By 2007, the number had increased to 4,060.[26]  In 2017, it had grown to 15,993 visas;[27]  In 2021, 24,904 TN visas were issued.[28]

---

[24] 9 F.A.M. § 402.17-5(A)(7) (the petitioner must file a Form I-129, Petition for Nonimmigrant Worker).

[25] See Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 1998) https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY1998_NIV_Detail_Table.pdf (last viewed March 25, 2022).

[26] See Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2007) https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY07NIVDetailTable.pdf (last viewed March 25, 2022).

[27] See Nonimmigrant Visa Issuances by Visa Class and Nationality, U.S. Department of State (FY 2017) https://travel.state.gov/content/dam/visas/Statistics/Non-Immigrant-Statistics/NIVDetailTables/FY17NIVDetailTable.pdf (last viewed March 25, 2022).

[28] See Nonimmigrant Visas Issued by Classification: Fiscal Years 2017-2021, U.S. Department of State (2021). Though the State Department had not yet broken down the 2021 TN visas issued by nationality, over 99 percent of TN visas

74.     Oversight of TN visa holders' working conditions in the United States is largely unregulated.  As a consequence, there have been multiple reports of abuses—including misrepresentations in employment contracts—of TN workers.[29]

## V.   **Statement of Facts**

### a.  **The RICO Fraud**

75.     The acts and omissions described in paragraphs 76-151, *infra*, were committed by the indicated Defendant or Defendants through the RICO Enterprises.

76.     As set forth herein, Defendants participated in the operation or management of the RICO Enterprises.

77.     Alternatively, as set forth herein, the AKS Defendants participated in the operation or management of the RICO Enterprises and Defendants TESS conspired to further and participate in the objectives of the RICO Enterprises to engage in a fraudulent scheme.

_____

historically have been issued to Mexican—rather than Canadian—citizens. *See generally,* n's. 10-12, *supra.*

[29] Coerced under NAFTA: Abuses of Migrant Workers in the TN Visa Program and Recommendations for Reform, Centro de los Derechos del Migrante (Dec. 2017), https://cdmigrante.org/wp-content/uploads/2018/01/Coerced-under-NAFTA_-Abuses-of-Migrant-Workers-in-TN-Visa-Program.pdf (last viewed March 25, 2022).

78.    In January 2020, Mr. Obregon saw an AGWM job posting for a Quality Control Engineer in the southeastern United States.  The posting was on the BUMERAN website.

79.    On or about January 23, 2020, Mr. Obregon applied for the position, which included submitting his resume in Spanish.

80.    On January 23, 2020, Ana Maria Rodriguez of AGWM sent Mr. Obregon an email confirming receipt of his resume for the position of a Quality Control Engineer in the southeastern United States.  The email instructed Mr. Obregon to resubmit his resume in English.

81.    On January 24, 2020 at 8:31 a.m., Mr. Obregon resubmitted his resume to AGWM in English, but in pdf format.

82.    At 3:28 p.m. the same day, Ana Maria Rodriguez sent an email to Mr. Obregon asking him to resubmit his resume again in Word format.  He did so nine minutes later.

83.    On September 12, 2020, AGWM principal Julian Kim sent Mr. Obregon an email.  In the email, Julian Kim indicated among other things,

   a.  The email was not a scam ("estafa" in Spanish) or hoax ("engaño" in Spanish);

   b.  SMART was interested in hiring him;

    c.  He would work on the production line for one year and would receive a promotion to an engineer position through his evaluation;

    d.  His salary would be "$38,000-$43,000 (overtime) United States dollars" per year;

    e.  His employment would be for a period of one year, with the ability to extend this period;

    f.  He would receive two months of housing and transportation assistance as part of his compensation;

    g.  He would be sponsored for a green card after 18 months;

    h.  He should respond by completing an attached form "as soon as possible" to schedule an interview with SMART; and

    i.  AGWM was looking for 61 workers.

84.    Upon information and belief, AGWM sent similar emails between 2019 and 2021 to dozens of Mexican engineers for the purpose of securing TN visas for employment at SMART.

85.    At the time Julian Kim sent the emails described in paragraph 83 and 84, he:

a. knew Defendant SMART would misrepresent to the United States government that Mr. Obregon and other TN visa holders would be employed as an Industrial Quality Engineers, rather than as production line workers;

b. knew and intentionally omitted the material fact that

    i. the misrepresentation to the United States government would impact Mr. Obregon's future eligibility for a green card;

    ii. the misrepresentations to the United States government would serve as a bar to Mr. Obregon's entry into the United States;

c. knew and intentionally omitted the material fact that (1) a TN visa is a non-immigrant visa; (2) someone entering the United States on a TN visa cannot have immigrant intent; and (3) therefore, the promise of future green card was incompatible with the TN visa.

86.     Defendants AGWM and SMART used the false green card sponsorship promise to bait Ms. Obregon and other Mexican engineers into continuing forward with the TN visa application process.

87.     On September 13, 2020, Mr. Obregon completed the required

AGWM form and emailed it to AGWM.  The form listed SMART as the

employer.

88.     On September 15, 2020. Mr. Obregon had a Skype interview with

SMART Employee Relations Specialist Cynthia Rios and a Korean Assembly

Department Manager.

89.     During the Skype interview, Ms. Rios told Mr. Obregon he would be

eligible and sponsored for a green card after 18 months.

90.     During the Skype interview, Ms. Rios knew and intentionally

omitted the material facts that:

a.  SMART would misrepresent to the United States government

that Mr. Obregon would work as an Industrial Quality Engineer;

b.  this misrepresentation to the United States government would

impact Mr. Obregon's future eligibility for a green card; and

c.  the misrepresentations to the United States government would

serve as a bar to Mr. Obregon's entry into the United States.

91.     During the Skype interview, Ms. Rios knew and intentionally

omitted the material fact that (1) a TN visa is a non-immigrant visa; (2) someone

entering the United States on a TN visa cannot have immigrant intent; and (3)

therefore, the promise of green card sponsorship was incompatible with the TN visa.

92.     Ms. Rios and other SMART representatives conducted dozens of interviews of Mexican engineers recruited by AGWM and TESS between 2019 and the present and made similar misrepresentations.

93.     Ms. Rios used the false green card promise to bait Ms. Obregon and other Mexican engineers into continuing forward with the TN visa application process.

94.     On September 15, 2020, Julian Kim sent an email to Mr. Obregon on behalf of AGWM. In the email, Julian Kim indicated, among other things,

    a.  Mr. Obregon was selected for the position at SMART;

    b.  Mr. Obregon should review the attached job offer, sign it, and email it to WK Law as soon as possible; and

    c.  After Mr. Obregon sent the signed job offer to Woon Kim and WK Law would send an email requesting the documents that were necessary for the visa application.

95.     At the time Julian Kim sent the email described in paragraph 94, he had the Defendant SMART's express authority to make those statements.

96.     The job offer attached to Julian Kim's September 15, 2020 email

a. Was signed by SMART Administration General Manager Gary

Sport;

b. Indicated as follows:

I am pleased to offer you an employment as Quality Engineer at
SMART Alabama, LLC. I am confident that your academic
background and professional knowledge will be a valuable asset
to the growth of this company's business in the US. Per our
agreement, the terms and conditions of your employment shall
be as the following:

• Job Title: Quality Engineer
• Position: Up to 1 year from September 21, 2020, but contingent
upon the approval of TN Visa by the US consulate
• Purpose: Annual salary of $38,000.00 (Full Time, based on the
terms and conditions).

97.     Through Defendants AGWM and TESS, Defendant SMART sent job

offers making the same or substantively similar misrepresentations to dozens of

Mexican engineers between 2019 and the present.

98.     At the time AGWM and SMART representatives provided the job

offers described in paragraphs 96-97, the AGWM, TESS. and SMART

representatives knew Mr. Obregon and other Mexican engineers would work as

production line workers, rather than as a Quality Engineers, at SMART.

99.     At the time SMART provided the job offers described in paragraphs

96-97, SMART management personnel knew:

a. Mr. Obregon and the other Mexican engineers would work as hourly, rather than a salaried, employees;

b. if a full-time employee earning $38,000 per year worked 40 hours per week, Mr. Obregon's and the other Mexican engineers' hourly wage rate would be $18.27 per hour;[30]

c. Mr. Obregon's and the other Mexican engineers' regular hourly wage rate would be far less than $18.27 per hour; and

d. Mr. Obregon's and the other Mexican engineers' wages would be less than the equivalent of $38,000 per year, even factoring in overtime premiums.

100.   On September 15, 2020, Defendants Woon Kim and WK Law, as agents of AGWM and SMART, sent Mr. Obregon an email

a. introducing himself;

b. referencing an attached "basic document list" and asking Mr. Obregon to send the listed documents;

c. referencing an attached "questionnaire form" and asking Mr. Obregon to answer the questions on the form;

---

[30] As indicated above, the September 12, 2020 email from Julian Kim to Mr. Obregon indicated the salary would be between $38,000 and $43,000 per year, with the amount of overtime impacting that range.

    d.  Informing Mr. Obregon of the consular interview process; and

    e.  Describing the process to pay the U.S. government fee for

       processing the TN visa.

101.    A Certificate showing Woon Kim's admission to practice law in New York also was attached to his September 15, 2020 email.

102.    Though Woon Kim and WK Law are based in Duluth, Georgia, Woon Kim is not licensed to practice law in Georgia.

103.    Defendants Woon Kim and WK Law sent the same or substantively similar emails to dozens of Mexican engineers between 2019 and the present.

104.    On September 17, 2020, Mr. Obregon transmitted the requested completed questionnaire and supporting documents by email to Woon Kim. They then exchanged additional emails related to the questionnaire and documents later on September 17, 2020; on September 18, 2021; on September 21, 2021; and on September 23, 2021.

105.    Woon Kim, Ellie Kim (an employee of WK Law), and Mr. Obregon exchanged emails about the consular interview process and scheduling on September 30, 2020 and October 1, 2020.

106.    On October 1, 2020, Woon Kim sent Mr. Obregon two emails. The first email included:

a. a letter signed by Woon Kim to the U.S. Consulate in
   Guadalajara, Mexico attaching documents purportedly
   supporting Mr. Obregon's TN visa application;

b. a DS-160 form, which Woon Kim indicated Mr. Obregon should
   use for consular interview preparation but should not bring to
   the interview;

c. a position description sheet, which Woon Kim also indicated Mr.
   Obregon should use for consular interview preparation but
   should not bring to the interview.  The description sheet listed
   the duties of an Industrial Quality Engineer at SMART.  The
   duties did not include work on the production line as an
   assembly worker; and

d. an interview preparation sheet, which Woon Kim also indicated
   Mr. Obregon should use for consular interview preparation but
   should not bring to the interview.  The preparation sheet:

   i. instructed Mr. Obregon to inform the consular official that
      he intended to return to Mexico after completing the work
      and specifically indicated he should not say he would

apply for permanent residency (green card) in the United
States;

    ii.  informed Mr. Obregon his application would be denied if
he indicated he intended to, *inter alia*, apply for a green
card; and

    iii.  informed Mr. Obregon that it is not necessary to provide
all information, and that he should only answer the
consular officer's questions.

107.    Defendants Woon Kim and WK Law sent emails and attachments
making the same or substantively similar misrepresentations to dozens of
Mexican engineers between 2019 and the present.

108.    At the time Woon Kim sent the email and attachments described in
paragraphs 106 and 107, he was acting as an agent for and with the express
authority of SMART and AGWM.

109.    At the time Woon Kim sent the email and attachments described in
paragraphs 106 and 107, he had an attorney-client relationship with Mr.
Obregon.

110.    Mr. Obregon had a good faith basis for relying on Woon Kim's
advice.

111.    At the time Woon Kim sent the email and attachments described in paragraphs 106 and 107, Woon Kim knew:

    a.   Mr. Obregon and other Mexican engineers would not work at SMART as Industrial Quality Engineers, but rather would work on the production line as an assembly workers;

    b.   SMART and AGWM had informed Mr. Obregon and other Mexican engineers that they would be sponsored for green cards after working at SMART for 18 months;

    c.   (1) a TN visa is a non-immigrant visa; (2) someone entering the United States on a TN visa cannot have immigrant intent; and (3) therefore, the promise of green card sponsorship was incompatible with the TN visa;

    d.   any misrepresentations made to the U.S. government likely would make Mr. Obregon and other Mexican engineers ineligible for green cards; and

    e.   the misrepresentations to the United States government would serve as a bar to Mr. Obregon's entry into the United States.

112.    Mr. Obregon and other Mexican engineers relied on the material omissions and misrepresentations set forth in paragraphs 106-107.

113.   In the communications with Mr. Obregon and other Mexican engineers described herein, Woon Kim did not use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of tasks which they undertake.

114.   The second October 1, 2020 email Woon Kim sent to Mr. Obregon included, as an attachment, SMART's letter supporting Mr. Obregon's TN visa application ("TN Support Letter").

115.   On October 1, 2020, Gary R. Sport, Administration General Manager of SMART Automotive, signed the TN Support Letter addressed to the Acting Nonimmigrant Visa Section Chief of the United States Consulate in Guadalajara, Jalisco, Mexico.

116.   The TN Support Letter, *inter alia*,

a.   indicated Mr. Obregon would be employed for "one year, but this may be extended…";

b.   indicated Mr. Obregon would work "as an Industrial Quality Engineer in our Production Department at our facilities in Luverne, Alabam [*sic*]";

c.   detailed the work Mr. Obregon would perform as an Industrial Quality Engineer using the following words: "Evaluate…" twice,

"Assess and analyze…", "Oversee production…",

"Document…", "Work in coordination with Assembly Line and

Press Line team to advise and address inefficiencies…",

"Analyze…", "Deliver quality assurance…", "Adjust test plans or

methods…", "Stay updated…", "Perform supplier

assessments…"; and "Periodically review client complaints…";

d.  indicated Mr. Obregon's salary would be $38,000 annually;

e.  indicated SMART "verified Jaime Obregon Acosta's intent to

return to Mexico at the completion of his proposed assignment";

f.  indicated,

The duties of the position offered and the very nature of SMART
services require that a candidate possess a bachelor's degree in
Industrial Engineering, Quality Engineering, Mechanical
Engineering, or an engineering-related field. SMART typically
requires this educational credential as a minimum requirement for
entry into this occupation. This is also common to the
manufacturing industry in parallel positions in similar
organizations[;]

and

g.  identified Woon Kim of WK Law as "our attorney in this matter."

117.    SMART provided TN Support Letters making substantively the same misrepresentations to the U.S. government on behalf of dozens of Mexican engineers between 2019 and the present.

118.    At the time SMART submitted the TN Support Letters, Gary R. Sport and other SMART management personnel who authorized the letters knew Mr. Obregon and other Mexican engineers would not be employed at SMART as an Industrial Quality Engineer.  Rather, they knew:

    a.  Mr. Obregon and other Mexican engineers would work on the production line as assembly workers;

    b.  Mr. Obregon and other Mexican engineers would perform work that was identical to other employees with no engineering training or credentials;

    c.  engineering training and credentials were not required or necessary to perform the assembly line work; and

    d.  they had not verified Mr. Obregon's and other Mexican engineers' intent to return to Mexico at the completion of their assignments (on the contrary, they had promised to sponsor them for green cards);

    e.  Mr. Obregon's salary would not be $38,000 annually.

119.    Therefore, SMART made material misrepresentations in the TN Support Letters.

120.    The U.S. government, relying on SMART's misrepresentations in the TN Support Letter, issued a TN visa to Mr. Obregon.

121.    Similarly, the U.S. government, relying on SMART's misrepresentations in TN Support letters on behalf of dozens of Mexican engineers between 2019 and the present, issued TN visas to those engineers.

122.    On October 2, 2020, "Daniela" from AWGN sent Mr. Obregon a message on WhatsApp informing him that his TN visa had been approved.

123.    Between 2019 and the present, Defendant TESS also recruited Mexican TN visa holders for SMART by misrepresenting the nature of the work the TN visa holders would perform and promising green card sponsorship.

124.    By engaging in similar fraudulent recruitment practices on behalf of SMART, TESS adopted the goal of furthering the RICO Enterprises.

125.    By engaging in similar fraudulent recruitment practices on behalf of SMART, TESS participated in the objectives of the RICO Enterprises to engage in the fraudulent scheme.

126.    Defendants Woon Kim and WK Law provided legal representation to SMART, AWGN, Mr. Obregon, and other Mexican engineers for the purpose of securing TN visas for SMART employees.

127.    At the time Woon Kim and WK Law provided legal representation to SMART, AWGN, Mr. Obregon, and other Mexican engineers, it was acting as an agent of and with the authority of SMART and AWGN, and all its acts and omissions occurred within the scope of this agency.

128.    Defendants had substantially more economic strength than Mr. Obregon and other Mexican engineers when they formulated and executed the scheme to defraud Mr. Obregon, other Mexican engineers, and the United States government.

129.    If Mr. Obregon and other Mexican engineers bore any responsibility for participating in the scheme, it was far less than the Defendants' responsibility for formulating and executing the scheme.

130.    Defendants engaged in hundreds of similar separate fraudulent acts for the purpose of recruiting and employing dozens of Mexican TN visa holders between 2019 and the present.

131.    Defendants used the mail and wires for the purpose of executing the fraudulent scheme described in the preceding paragraphs.

132.    After returning to Mexico following his employment at SMART, Mr.
Obregon applied for a new TN visa to enter the United States for employment as
a Project Engineer with INGENICS at the Mercedes Benz manufacturing plant in
Alabama.

133.    In August 2021, the U.S. government denied Mr. Obregon's TN visa
application because the government claimed his TN visa for employment at
SMART was obtained through fraud or other material misrepresentations.

134.    The U.S. government denied Mr. Obregon's visa application
specifically because of the misrepresentations about the nature of the work Mr.
Obregon would perform at SMART.

135.    As a result of the TN visa denial, INGENICS withdrew Mr.
Obregon's job offer, and he remained in Mexico looking for employment.

136.    In December 2021, a German-American automotive supplier in
Mexico hired Mr. Obregon.

137.    Mr. Obregon had to renew his previously expired B1/B2 visa for
this new job.

138.    The B1/B2 visa was required because of the transnational nature of
the work.

139.    In March 2022, the U.S. government denied Mr. Obregon's B1/B2 visa application for the same reason it had denied his TN visa application.

140.    The same legal basis the U.S. government provided when it denied Mr. Obregon's visa applications also would be a basis to deny future applications for U.S. work visas, visitor visas, and/or a green card.

141.    But for Defendants' misconduct, Plaintiff would not have been denied the TN and B1/B2 visas, and the U.S. government would not have this basis for denying a future application for a work visa or green card.

142.    Wages for mechanical engineers and quality assurance engineers in Mexico are significantly lower than wages for the same professions in the United States.[31]

143.    Mr. Obregon's wages at his current employer are lower than the wages he would have received if he were able to legally enter the United States.

---

[31] *Compare, e.g.,* Average Quality Assurance (QA) Engineer Salary: Mexico, Payscale (Jan. 20, 2022), https://www.payscale.com/research/MX/Job=Quality_Assurance_(QA)_Engineer/Salary (median salary for QA engineer in Mexico is 240,000 Mexican pesos (MXN) per year, or approximately $11,214 U.S. dollars), *with* Average Quality Assurance (QA) Engineer Salary: United States, Payscale (June 15, 2022), https://www.payscale.com/research/US/Job=Quality_Assurance_(QA)_Engineer/Salary (median salary for QA engineer in the U.S. is $72,856 USD per year).

144.    Because Mr. Obregon was not able to return to the United States, a vehicle in the United States, which he was financing, was repossessed, and his initial investment in the vehicle was lost.

145.    Therefore, Mr. Obregon has suffered pecuniary losses that were directly and proximately caused by Defendants' scheme.  These damages include lost wages and employment opportunities, legal expenses, and lost personal property.

146.    Mr. Obregon also suffered these and other damages, including but not limited to emotional distress and reputational harm, that were directly and proximately caused by Woon Kim's and WK Law's breach of their duty to Mr. Obregon.

147.    Mr. Obregon and other Mexican engineers suffered additional pecuniary losses that were directly and proximately caused by Defendants' scheme, including (a) lower wages than what Defendants fraudulently promised during the recruitment process, (b) lost economic opportunities Mr. Obregon and other Mexican engineers would have had if the promise of green card sponsorship had not been fraudulent; lost personal propertly, and/or (c) legal expenses.

148.    The Defendants' fraudulent scheme described herein has been directed at dozens of Mexican engineers over the course of more than one year.

149.    The fraudulent scheme described herein has become a regular way of conducting the Defendants' ongoing legitimate businesses.

150.    Defendants intended to further the fraudulent scheme described herein.

151.    Defendants agreed to participate in the objective of the enterprises to engage in the fraudulent scheme described herein.

### b.  Employment Discrimination

152.    SMART employed both Hispanic Mexican citizens ("Mexican workers") and white and black U.S. citizen workers ("U.S. workers") performing similar work on SMART's production line.

153.    The Mexican workers with TN visas were paid an hourly wage rate that was significantly lower than the hourly wage rate paid to the U.S. workers.

154.    Upon information and belief, Mexican workers without TN visas also were paid an hourly wage that was significantly lower than the hourly wage rate paid to the U.S. workers.

155.    The Mexican workers were required to work significantly longer hours than the U.S. workers.

156.    SMART's disparate treatment of the Mexican workers as compared to the U.S. workers who performed the same or similar work constituted discrimination based on race and alienage, in violation of 42 U.S.C. § 1981.

157.    SMART's disparate treatment of the Mexican workers as compared to the U.S. workers who performed the same or similar work constituted discrimination based on race, color, and national origin, in violation of Title VII.

### c.   Failure to Pay Required Overtime Wages

158.    Mr. Obregon and other similarly situated TN visa holders regularly worked at SMART's operations in excess of 40 hours per week ("overtime") for the duration of their employment, including during the first two months of employment.

159.    During Mr. Obregon's and other similarly situated TN visa holders' first two months of employment, SMART provided them with hotel accommodations and a rental car.

160.    As set forth in the September 12, 2020 email described in paragraph 84, *supra*, the hotel accommodations and transportation assistance were regarded as part of Mr. Obregon's and other similarly situated workers' compensation.

161.   When calculating overtime wages, SMART did not include in the regular rate of pay the reasonable cost to SMART or the fair value of the housing and transportation assistance.[32]

162.   Therefore, SMART did not pay Mr. Obregon and other similarly situated TN visa holders overtime wages at a rate of one-and-one-half their regular rate of pay, as required by the FLSA.[33]

163.   The actions and omissions alleged above were willful in that SMART was aware of its obligations regarding overtime wages, showed reckless disregard for whether its conduct violated the FLSA, or acted without a reasonable basis to believe its actions were in compliance with the FLSA.

<u>FLSA Collective Action Allegations</u>

164.   Mr. Obregon brings his FLSA claims on behalf of himself and those individuals who may opt into this action pursuant to 29 U.S.C. § 216(b) and who were not paid required overtime wages at SMART's operations between July 12, 2019 and the date of preliminary approval of the opt-in class.

165.   Mr. Obregon and other TN visa holders were subject to the same policies and practices of SMART.

---

[32] *See* 29 C.F.R. § 778.116.
[33] *See* 29 U.S.C. § 207(a).

166.   Common proof applicable to Mr. Obregon and the other TN visa holders will show that SMART failed to properly pay their overtime wages.

167.   Mr. Obregon is currently unaware of the identities of all the employees who would be members of the FLSA opt-in class, but this information is readily ascertainable from the SMART's records, and particularly the Ceridian records located, upon information and belief at Ceridian's offices in the Northern District of Georgia.

168.   SMART therefore should be required to provide Mr. Obregon with a list—including last known addresses, telephone numbers, and email addresses if known—of all individuals who were TN visa holders employed at SMART's operations between July 12, 2019 and the present.

## Rule 23 Class Allegations

169.   Mr. Obregon brings his RICO claims against Defendants AWGM and SMART on behalf of himself and a class of persons ("the RICO Class") consisting of:

> All individuals who, between March 28, 2018 and the present, (1) were recruited by AWGM or TESS, (2) received wages from SMART; and (3) were TN visa holders.

170.   Mr. Obregon brings his Section 1981 and Title VII claims against Defendant SMART on behalf of himself and a class of persons ("the Discrimination Class") consisting of:

> All individuals who, between March 28, 2018 and the present, (1) were Hispanic Mexican nationals, and (2) were employed at SMART.

171.   Excluded from the Classes are the legal representatives, officers, directors, assigns, and successors of Defendants; any individual who at any time during the class period has had a controlling interest in any Defendant; and all persons who submit timely and otherwise proper requests for exclusion from the Classes.

### *Numerosity*

172.   There are over 40 individuals who would be members of the Classes in this action.

173.   The members of the Classes are sufficiently numerous that joinder of all members is impractical.

<u>*Existence and Predominance of Common Questions*</u>

174.   Common questions of law and fact exist as to Plaintiffs and all members of the Classes and predominate over questions affecting only individual Class members.

175.   These common questions include:

a)   whether the WKS Defendants — or all Defendants — through the RICO Enterprises, committed a pattern of racketeering activity causing Plaintiff and other TN visa holders to suffer pecuniary losses;

b)   Whether Defendant TESS conspired to participate in the objectives of the Enterprises to engage in a pattern of racketeering activity;

c)   Whether SMART discriminated against Plaintiff and other Hispanic Mexican workers (i) by paying them less than black and white U.S. citizen workers, and/or (ii) by requiring them to work longer hours than the black and white U.S. citizen workers; and

d)   The nature and extent of class-wide injury and the measure of damages for those injuries.

*Typicality*

176.    Members of the proposed Classes have all been subject to the same unlawful practices of Defendants, and their claims arise out of these same practices.

177.    Plaintiff and the proposed class members have the same statutory rights under RICO, Section 1981, and Title VII within the meaning of these laws.

178.    Plaintiff and the proposed members of the RICO Class were recruited under the same or similar circumstances giving rise to the same claims.

179.    Plaintiff and the proposed members of the Discrimination Class were employed under the same or similar circumstances giving rise to the same claims.

180.    Plaintiff and proposed class members suffered similar types of damages.

181.    Plaintiff's claims are typical of the claims of the Classes because, among other things, Plaintiff (a) was a TN visa holder; (b) is a Hispanic Mexican national; and (c) was an employee who worked for the SMART and suffered the same violations as the proposed class members.

182.    Plaintiff's interests are co-extensive with the interests of the Class members; Plaintiff has no interest adverse to the Class members.

<u>*Adequacy*</u>

183.   Plaintiff will fairly and adequately represent the interests of the Class members.   His interests do not conflict with the interests of the members of the Classes he seeks to represent.

184.   Plaintiff understands that, as a Class representative, he assumes a responsibility to the Class to represent its interests fairly and adequately.

185.   Plaintiff has retained counsel experienced in prosecuting class actions and in employment matters.  There is no reason why Plaintiff and his counsel will not vigorously pursue this matter.

<u>*Superiority*</u>

186.   A class action is superior to other available means for the fair and efficient adjudication of the claims at issue herein.

187.   The damages suffered by each individual Class member may not be sufficient to justify the burden and expense, particularly in light of the transnational nature of this case, of individual prosecution of the litigation necessitated by Defendants' conduct.

188.   Further, it would be difficult for members of the Classes to obtain individual redress effectively for the wrongs done to them.   If individual actions

were to be brought by each member of the Classes, the result would be a multiplicity of actions, creating hardships for members of the Classes, the Court, and the Defendants.

189.   Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system.

190.   By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

191.   This case does not present individualized factual or legal issues which would render a class action difficult.

192.   In the alternative, the Classes may be certified because: (a)  the prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect

their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

### VI.   <u>Legal Claims</u>

<u>Count I</u>

<u>Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-68</u>
<u>(Class Claim)</u>
<u>(Against All Defendants)</u>

193.   Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

194.   This Count sets forth claims by Plaintiff and other members of the RICO Class against all Defendants for damages resulting from Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-68.

195.   Plaintiff is a "person" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

196.   Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

197.    The RICO Enterprises, as defined in paragraphs 59-62, *supra*, are association-in-fact enterprises with the common purpose to recruit, contract, transport, and employ Mexican TN visa holders to work at SMART's business operations in Alabama.

198.    The RICO Enterprises are engaged in and affect interstate commerce

199.    The RICO Enterprises function as continuing units.

200.    The Defendants conducted or participated—and/or conspired to do so—in the affairs of the RICO Enterprises, through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and/or 18 U.S.C. § 1962(d), related by their common purpose.

201.    Specifically, the Defendants conducted or participated—and/or conspired to do so—in the affairs of the RICO Enterprises by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

    a.  Mail fraud in violation of 18 U.S.C. § 1341;

    b.  Wire fraud in violation of 18 U.S.C. § 1343; and

    c.  Fraud in foreign labor contracting in violation of 18 U.S.C. § 1351.

*Predicate Acts*

Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343

202.    As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, made—and/or conspired to make—material misrepresentations to the U.S. government and to TN visa applicants regarding the nature of Plaintiff's and other RICO Class members' work, the hours they would work, and the wages they would receive.

203.    As set forth in the preceding paragraphs, the Defendants, though the RICO Enterprises, used and/or conspired to use the mails and wire communications, including communications via telephone, fax, internet, and/or email, on numerous occasions to further these fraudulent schemes.

204.    These willful, knowing, and intentional acts constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

Fraud in Foreign Labor Contracting: 18 U.S.C. § 1351

205.    As set forth in the preceding paragraphs, the Defendants, through the RICO Enterprises, knowingly and with intent to defraud, recruited, solicited, and hired Plaintiff and other RICO Class members outside the United States—and/or conspired to do so—for the purpose of employment in the United States

by means of materially false or fraudulent pretenses, representations, or promises regarding the nature of Plaintiff's and other RICO Class members' work, the hours they would work, and the wages they would receive.

206.   These willful, knowing, and intentional acts constitute fraud in foreign labor contracting in violation of 18 U.S.C. § 1351.

*Pattern of Related Racketeering Acts*

207.   The Defendants engaged in the racketeering activity described in this claim repeatedly in 2019 through the present.

208.   The Defendants, through the RICO Enterprises, rely on the racketeering acts described in this Complaint to conduct their regular business activities.

209.   The Defendants' racketeering acts have or had similar purposes: to profit from the fraud Defendants committed in the contracting, hiring, and employment of Plaintiff and other RICO Class members.

210.   Each of the Defendants' acts yielded similar results and caused similar injuries to Plaintiff and other RICO Class members, including underpayment of wages and lost employment opportunities.

211.   As set forth in the preceding paragraphs, the racketeering acts have or had similar participants: the Defendants and their agents.

212.    As set forth in the preceding paragraphs, the Defendants, through

the RICO Enterprises, directed their racketeering activities at similar individuals

and entities: Plaintiff and other RICO Class members, and federal government

agencies.

213.    The Defendants' acts have or had similar methods of commission,

such as common recruitment tactics and use of similar employment practices and

policies with respect to Plaintiff and other RICO Class members.

*Conspiracy*

214.    As set forth herein, Defendants conspired to violate the RICO, by

agreeing to participate in the objectives of the Enterprises to engage in the

pattern of racketeering activity.

*Injury and Remedies*

215.    As a direct and proximate result of the Defendants' willful,

knowing, and intentional acts discussed in this section, Plaintiff and RICO Class

members have suffered injuries to their property, including but not limited to

wage underpayments, lost employment opportunities, and/or other pecuniary

losses.

216.    Plaintiff and other RICO Class members are entitled to an award of

damages in an amount to be determined at trial, including but not limited to:

    a.  compensation for their injuries to their property;

    b.  trebling of the damages set forth in subparagraph (a), *supra*; and

    c.  attorneys' and experts' fees and costs associated with this action,

        as authorized by 18 U.S.C. § 1964(c).

## **Count II**

### Employment Discrimination in Violation of 42 U.S.C. § 1981
### (Class Claim)
### (Against Defendant SMART)

217.    The Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

218.    This Count sets forth claims by Plaintiff and other members of the Discrimination Class against Defendant SMART for damages resulting from violations of 42 U.S.C. § 1981 ("Section 1981").

219.    The actions of SMART, as set forth herein, violated Plaintiff's and other Discrimination Class members' rights to receive full and equal benefit of all laws as guaranteed by Section 1981, including Plaintiff's and other Discrimination Class Members' rights to enjoy and benefit from non-discriminatory employment relationships with SMART.

220.    As set forth herein, SMART imposed discriminatory terms and conditions of employment on Plaintiff and other Discrimination Class members—specifically paying lower hourly wages and requiring longer work hours—to which black, white, and/or U.S. citizen employees were not similarly subjected.

221.    SMART knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiff and other Discrimination Class members of their rights.

222.    Plaintiff and other Discrimination Class members seek all appropriate relief in an amount to be determined at trial, including, but not limited to:

       a.   compensatory damages for the deprivation of Plaintiff's and other Discrimination Class members' civil rights;

       b.   punitive damages for SMART's malicious and reckless discriminatory conduct; and

       c.   attorneys' and experts' fees and costs of this action.

## Count III

Employment Discrimination in Violation of Title VII

(Class Claim)

(Against Defendant SMART)

223.   The Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

224.   This Count sets forth claims by Plaintiff and other members of the Discrimination Class against Defendant SMART for damages resulting from SMART's violations of § 702(a) of Title VII, 42 U.S.C. § 2000e-2(a) ("Title VII").

225.   For the entire term of their employment, SMART subjected Plaintiff and other members of the Discrimination Class to terms and conditions of employment that were less favorable than those enjoyed by their counterparts who were not Hispanic and/or of Mexican national origin.

226.   This unequal treatment included but was not limited to lower wages and longer work hours.

227.   The unlawful employment practices complained of in the preceding paragraphs were intentional and done with malice or with reckless indifference to the federally protected rights of Plaintiff and other Discrimination Class members.

228.    The effect of these intentional practices has been to deprive Plaintiff and other Discrimination Class members of equal employment opportunities and otherwise adversely affect their status as employees because of their race, color, and/or national origin.

229.    Plaintiff and other Discrimination Class members seek all appropriate relief in an amount to be determined at trial, including, but not limited to:

a.  compensatory damages for the deprivation of Plaintiff's and other Discrimination Class members' rights as set forth in this Count;

b.  punitive damages for SMART's malicious and reckless discriminatory conduct; and

c.  attorneys' and experts' fees and costs of this action.

## Count IV

Fair Labor Standards Act Violations
(Collective Action Claim)
(Against Defendant SMART)

230.    The Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

231.    This count sets forth a claim by Plaintiff, and by all similarly situated workers who opt into this action pursuant to 29 U.S.C. § 216(b), for damages resulting from Defendant SMART's violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207.

232.    Plaintiff and other TN visa holders regularly—including in their first two months of employment—worked more than 40 hours in a single work week.

233.    During their first two months of employment, SMART willfully failed to pay Plaintiff and the other TN visa holders an overtime premium of one half of their regular rate of pay for every hour they worked above 40 in a work week.

234.    SMART's failure to pay an overtime premium for hours above 40 in a work week violated the FLSA, 29 U.S.C. § 207(a), and its implementing regulations.

235.    Plaintiff and the other TN visa holders are entitled to their unpaid wages, plus an additional equal amount in liquidated damages, as a consequence of Defendant's unlawful actions and omissions, in accordance with 29 U.S.C. § 216(b).

236.    Plaintiff and the other TN visa holders are also entitled to costs of Court, pursuant to 29 U.S.C. § 216(b).

237.    Plaintiff and the other TN visa holders also seek, and are entitled to, the attorneys' fees incurred by their counsel, pursuant to 29 U.S.C. § 216(b).

## Count V

Malpractice
(Individual Claim by Plaintiff)
(Against Defendants Woon Kim and WK Law)

238.    The Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth fully here.

239.    This count sets forth a claim by Plaintiff individually for damages resulting from Defendant Woon Kim's and Defendant WK Law's malpractice.

240.    An attorney-client relationship existed between WK Law principal Woon Kim and Plaintiff.

241.    WK Law principal Woon Kim failed to provide ordinary care, skill, and diligence in his representation of Plaintiff.

242.    Plaintiff suffered damages caused and proximately caused by WK Law principal Woon Kim's failure to provide ordinary care, skill, and diligence in his representation of Plaintiff.

243.    Woon Kim and WK Law's misconduct was intentional, malicious, or fraudulent.

244.    Woon Kim and WK Law's misconduct rose to the level of bad faith in dealing with Plaintiff.

245.    Plaintiff seeks all appropriate relief in an amount to be determined at trial, including, but not limited to:

    a.  compensatory damages for the deprivation of Plaintiff's and rights as set forth in this Count;

    b.  punitive damages; and

    c.  attorneys' and experts' fees and costs of this action.

**VII.    <u>Demand for Trial by Jury</u>**

246.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all questions of fact raised by this Class Action Complaint.

## VIII.  <u>Request for Relief</u>

WHEREFORE, Plaintiff requests that this Court enter an Order:

a.      assuming jurisdiction over this action;

b.      certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Class Counsel;

c.      declaring this action to be maintainable as a FLSA collective action pursuant to 29 U.S.C. § 216, allowing Plaintiff to provide notice of this action to potential opt-in plaintiffs, and allowing those eligible TN visa holders who choose to do so to opt into this action;

d.      declaring that Defendants violated the RICO;

e.      declaring Defendant SMART violated Section 1981, Title VII, and the FLSA;

f.      declaring WK Law committed legal malpractice with respect to Plaintiff;

g.      permanently enjoining Defendants from further violations of the RICO;

h.      permanently enjoining Defendant SMART from further violations of Section 1981, Title VII, and the FLSA;

i.      granting judgment to Plaintiff and other RICO Class members, and against all Defendants, on Plaintiff's and other RICO Class members' RICO claims and awarding them the trebled amount of their pecuniary losses;

j.      granting judgment to Plaintiff and other Discrimination Class members, and against Defendant SMART, on Plaintiff's and other Discrimination Class members' claims pursuant to Section 1981 and awarding compensatory and punitive damages;

k.      granting judgment to Plaintiff and other Discrimination Class members, and against Defendant SMART, on Plaintiff's and other Discrimination Class member's claims pursuant to Title VII and awarding compensatory and punitive damages;

l.      granting judgment to Plaintiff and other similarly situated TN visa holders who opt in pursuant to 29 U.S.C. § 216(b) on their FLSA claims, and against Defendant SMART, and awarding each of them their unpaid wages plus an equal amount in liquidated damages;

m.      granting judgment to Plaintiff and against Defendant WK Law, and warding Plaintiff compensatory and punitive damages;

n.      Awarding Plaintiff and other Class members prejudgment and postjudgment interest as allowed by law;

o.      Awarding Plaintiff and other Class members their costs and

reasonable attorneys' fees; and

p.      Granting such further relief as the Court finds just.

        Respectfully submitted this day: July 12, 2022.

                                        */s/ Daniel Werner*
                                        Daniel Werner
                                        Georgia Bar No. 422070
                                        dan@decaturlegal.com
                                        James Radford
                                        Georgia Bar No. 108007
                                        james@decaturlegal.com
                                        RADFORD & KEEBAUGH, LLC
                                        315 W. Ponce de Leon Ave.
                                        Suite 1080
                                        Decatur, Georgia 30030
                                        (678) 271-0300

                                        *Attorneys for Plaintiff*

<u>CERTIFICATE OF SERVICE AND FONT</u>

This is to certify that on July 12, 2022, I prepared the foregoing in Book Antiqua, 13-point type in accordance with L.R. 5.1(C) and that I electronically filed the document with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all counsel of record.


/s/ Daniel Werner
Daniel Werner
Attorney for Plaintiff



CONSENT TO SUE

I hereby agree and consent to be a plaintiff in the judicial lawsuit under the overtime provisions of the Fair Labor Standards Act with respect to my labor with SMART Alabama, LLC and other related individuals and/or businesses.

Jaime Obregon Acosta
_____
Full Name

*Jaime Obregon Acosta*
Jaime Obregon Acosta (May 24, 2022 12:40 CDT)
_____
Signature

May 24, 2022
_____
Date